911 F.2d 1532
 Fed. Sec. L. Rep. P 95,487
Kenneth E. PELLER, Custodian for Arthur David Peller,
Plaintiff-Appellee,
Kelly Antoinette Peller, under Ougma suing derivatively, in
the right and for the benefit of the Southern
Company and Georgia Power Company, Plaintiff,
v.
SOUTHERN COMPANY; Georgia Power Company; Edward L.
Addison; Alan R. Barton; William J. Cabaniss, Jr.;
Charles H. Chapman, Jr.; A.W. Dahlbery; Joseph M. Farley;
John W. Langdale; Douglas L. McCrary; Earl L. McLean, Jr.;
William S. Morris, III; William A. Parker, Jr.; H.G.
Pattillo; Robert H. Radcliff, Jr.; Crawford Rainwater;
William J. Rushton, III; Robert W. Scherer; Gloria M.
Shatto, Dr.; Herbert Stockman; A.F. Dantzler; Frank P.
Samford, Jr.; Alvin W. Vogtle, Jr.; V.J. Daniels, Jr.;
W.G. Autrey; H.G. Baker, Jr.; Bennett A. Brown; W.A.
Fickling, Jr.; L.S. Flowers; J.A. Gantt; L.G. Hardman,
III; Warren Y. Jobe; Richard J. Kelly; George W. Edwards,
Jr.; James H. Miller, Jr.; Robert Strickland; William B.
Tuner; Carl Ware and T.R. Williams, Defendants-Appellants.
 No. 89-8744.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 14, 1990.
 
 John J. Dalton, Kevin C. Greene and Winifred D. Simpson, Troutman Sanders Lockerman & Ashmore, Atlanta, Ga., Robert G. Stachler, G. Jack Donson, Taft, Stettinius & Hollister, Cincinnati, Ohio, William O. Fifield, Howard J. Trienens, Sidley & Austin, Chicago, Ill., Griffin B. Bell, Frank C. Jones, Martin Robert Thornton, King & Spalding, Atlanta, Ga., for defendants-appellants.
 Michael Grant Kohn, Gene Mesh & Associates, Cincinnati, Ohio, for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before JOHNSON and CLARK, Circuit Judges, and BROWN*, Senior District Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 Defendants the Southern Company ("Southern"), the Georgia Power Company ("Georgia Power"), and thirty-seven of their present and former corporate directors (collectively, "the Companies"), appeal from the district court's denial of their motion for dismissal or, alternatively, for summary judgment in this derivative shareholder action brought by plaintiff Kenneth E. Peller ("Peller"), custodian for Arthur David Peller.[1]
 
 I. STATEMENT OF THE CASE
 
 2
 Georgia Power, a Georgia corporation, is a wholly owned subsidiary of Southern, a Delaware corporation. Georgia Power operates electric utilities and power-generating plants across the Southeast and provides most of Georgia's electrical power. Peller, an attorney and a shareholder of Southern, brought this derivative action for more than 800 million dollars against the Companies on April 30, 1986, contending that the Companies and their directors acted negligently and breached their fiduciary duties to the shareholders during the sixteen-year period since 1970. Peller's allegations focused specifically on a series of decisions by the Companies authorizing Georgia Power to begin and complete construction of the Alvin W. Vogtle nuclear power plant ("the Vogtle plant") and the Rocky Mountain Pumped Storage Facility ("Rocky Mountain"). Peller did not make a demand on the Boards of Directors of Southern or Georgia Power prior to commencing his lawsuit.[2] On the contrary, he asserted that such a demand would have been futile because the defendant-directors were insiders who had participated in the conduct alleged in the complaint.
 
 
 3
 On July 18, 1986, the district court entered a consent order that stayed all aspects of this litigation pending the appointment and report of an independent litigation committee ("the Committee") to investigate Peller's claims. Initially the district court fixed December 31, 1986 as the deadline for the Committee's report. It eventually extended the deadline, however, to November 30, 1987. Established in September 1986, the Committee consisted of three directors chosen by the Companies who were not involved with them during the sixteen year period under dispute. The Companies gave the Committee the sole authority to evaluate the Peller litigation.
 
 
 4
 At the same time the Committee was undertaking its investigation, the Georgia Public Service Commission ("PSC") was considering a major rate case to determine whether to permit Georgia Power to recover the costs of constructing the Vogtle plant by increasing customer rates. By statute, the PSC was required to make its decision by October 2, 1987. After inspecting much of the same evidence reviewed by the Committee, the PSC found a number of imprudent management decisions by the Companies and disallowed approximately 300 million dollars from inclusion in the ratebase. Peller v. The Southern Co., 707 F.Supp. 525, 527 n. 2 (N.D.Ga.1988) (hereinafter "Peller II ").
 
 
 5
 After reviewing the decisions challenged by Peller, the Committee issued its report dated October 1, 1987. It determined that all of the challenged decisions were either correct or at least reasonable business judgments at the times they were made. Furthermore, it found that the actions of the defendants were neither arbitrary nor self-interested. The Committee therefore concluded that, as a matter of business judgment, the derivative action was neither in the best interests of the Companies nor their shareholders and should be dismissed. By issuing its report on October 1, 1987, just one day before the PSC's decision and well before the November 30 deadline imposed by the district court, the Committee deliberately chose not to wait for the PSC's outcome.
 
 
 6
 On October 13, 1987, the Companies moved for dismissal or, alternatively, for summary judgment on Peller's suit arguing that because demand was not excused the business judgment rule required the district court to defer to the Committee's determination that the suit should be dismissed.[3] On March 25, 1988, the district court ruled that Peller was excused from making a demand on the Companies, but the court found the record insufficient at that stage to evaluate the Committee's recommendation. Peller v. The Southern Co., [1987-1988 Transfer Binder], Fed.Sec.L.Rep. (CCH) p 93.714 at 98,318, 1988 WL 90840 (N.D.Ga.1988) (hereinafter "Peller I "). Limited discovery ensued, and the Committee filed a supplemental report. Following further briefing, on December 23, 1988, the district court denied the Companies' motion and ordered that the derivative suit go forward. Peller II, 707 F.Supp. at 531. On June 28, 1989, the district court denied the Companies' motion for reconsideration but clarified its December 1988 ruling in certain respects.[4] The district court certified for interlocutory appeal its denial of the Companies' motion.
 
 
 7
 In this appeal, we address the following three issues: (a) whether the district court assumed correctly that all relevant aspects of Delaware corporate caselaw should be deemed adopted by the Georgia courts; (b) whether the district court properly found that Peller was excused from making a demand on the Companies; and (c) whether the district court properly exercised its discretion to reject the recommendation of the Committee and permit the derivative suit to proceed.
 
 II. ANALYSIS
 A. Standard of Review
 
 8
 The Companies initiated their motion to dismiss or, alternatively, for summary judgment pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 56. However, shareholder derivative suits are governed by Fed.R.Civ.P. 23.1[5], and the district court correctly reviewed the Companies' motion under this rule. Specifically, Rule 23.1 required the district court to resolve the preliminary question of whether a demand was excused before it could determine whether to grant the Companies' motion. We review the district court's denial of the motion for dismissal pursuant to Rule 23.1 for abuse of discretion. Rothenberg v. Security Management Co., Inc., 667 F.2d 958, 960 (11th Cir.1982).
 
 B. Choice of Law
 
 9
 The district court found, and the parties agree, that under Burks v. Lasker, 441 U.S. 471, 478, 99 S.Ct. 1831, 1837, 60 L.Ed.2d 404 (1979), issues relating to Southern, as a Delaware corporation, are governed by Delaware law, and issues relating to Georgia Power, as a Georgia corporation, by Georgia law. Peller I, 1987-1988 Fed.Sec.L.Rep. (CCH) at 98,310, 1988 WL 90840. Nevertheless, the Companies challenge the district court's application of state law. The Companies argue that the district court erred by assuming that Delaware law applied to the "demand-excusal" issue (discussed in Part II(C) infra ) as to both Southern and Georgia Power. They contend that a finding that Peller was excused under Delaware law for not making a demand on Southern does not suffice to answer the question of whether he was excused under Georgia law for not making a demand on Georgia Power.
 
 
 10
 Peller argues convincingly, however, that this issue is illusory. He notes that he is a shareholder only of Southern, not Georgia Power. Georgia Power is wholly owned by Southern; therefore, Southern is Georgia Power's only shareholder. Only Southern is authorized to make a demand on Georgia Power in connection with a shareholder derivative suit. As a matter of logic and common sense, if Peller was excused properly from making a demand on Southern, he must be excused from making a demand on Georgia Power as Southern's wholly-owned subsidiary and corporate entity. Therefore, we find that the district court analyzed correctly the demand-excusal issue solely under Delaware law.
 
 
 11
 Second, and more generally, the Companies dispute whether the Delaware case of Zapata Corp. v. Maldonado, 430 A.2d 779 (Del.1981), should be deemed authoritative under Georgia law. As the district court found, there is no Georgia caselaw relating to the proper standard for dismissal of a shareholder derivative suit under the circumstances of this case. See Peller I, 1987-1988 Fed.Sec.L.Rep. (CCH) at 98,311, 1988 WL 90840. While the parties agree that Georgia law should incorporate the relevant parts of the far more extensively developed Delaware corporate caselaw, they debate whether Zapata, specifically, represents an innovation which has gained "majority" acceptance among the states. Resolution of this issue essentially requires an educated prediction as to what the Georgia courts would do in an area where there is no significant Georgia caselaw. The district court, relying on its experience interpreting and applying Georgia law, assumed that Georgia would follow Delaware caselaw. Because this Court recognizes the general principle that "a district court's interpretation of the law of the state where it sits ... is entitled to deference," we accept the district court's determination of the status of Georgia law. Shipes v. Hanover Ins. Co., 884 F.2d 1357, 1359 (11th Cir.1989).
 
 C. The Demand-Excusal Issue
 
 12
 In determining whether a shareholder is excused from making a demand, Delaware courts examine the response of a challenged board when first confronted with a derivative suit. If a board responds to a derivative suit by appointing a special litigation committee with the sole authority to evaluate whether to pursue the litigation before making a motion to dismiss for failure to make a demand, then a court may conclude that the board has conceded its disqualification and therefore demand may be excused. Abbey v. Computer & Communications Technology Corp., 457 A.2d 368, 374 (Del.Ch.1983); Spiegel v. Buntrock, 571 A.2d 767, 776-77 (Del.1990). By contrast, if a board responds to a derivative suit by filing a motion to dismiss for failure to make a demand before appointing a special litigation committee to evaluate the suit, a court may not find that such a board has conceded that demand is excused. Spiegel v. Buntrock, 571 A.2d at 776-77; See Richardson v. Graves, 1983 WL 21109 (Del.Ch.) (noting the importance of whether the challenged Board filed its motion to dismiss before or after appointing a special litigation committee in ruling whether a demand is excused). The district court found that by appointing the Committee and delegating to it the sole authority to evaluate whether to pursue the Peller litigation before seeking a motion to dismiss for failure to make a demand, the Companies effectively conceded that demand was excused. Peller I, 1987-1988 Fed.Sec.L.Rep. (CCH) at 98,311, 1988 WL 90840.
 
 
 13
 On appeal, the Companies contend that the district court misread Abbey. Specifically, the Companies refer this Court to the recent decision of the Delaware Supreme Court in Spiegel which clarifies the holding in Abbey. In Spiegel, the Delaware Supreme Court held that "the decision of a board of directors to appoint a special litigation committee, with a delegation of complete authority to act on a demand, is not, in all instances, an acknowledgment that demand was excused and ergo that a shareholder's lawsuit was properly initiated as a derivative." Spiegel v. Buntrock, 571 A.2d at 777 (emphasis in original).
 
 
 14
 Contrary to the Companies' contention, the Delaware Supreme Court's clarification of Abbey supports the district court's finding that Peller was excused from making a demand because of futility. The facts in the Abbey and Spiegel cases differ sharply. In Abbey, the challenged board responded to a shareholder's derivative complaint alleging that demand was excused by appointing a special litigation committee with the sole authority to determine the board's response. The board in Abbey did not make a motion to dismiss for failure to make a demand until after it had appointed a special litigation committee. Abbey v. Computer & Communications Technology Corp., 457 A.2d at 370-71. Under these circumstances, the Delaware court ruled that the board had conceded its disqualification, thereby excusing demand.
 
 
 15
 By contrast, in Spiegel, the challenged board responded to a shareholder plaintiff's derivative complaint by filing a motion to dismiss for failure to make a demand. The shareholder plaintiff then reacted to the board's motion by making a demand, thereby prompting the board to appoint a special litigation committee. Thus, the board in Spiegel made a motion to dismiss before it appointed a special litigation committee. Spiegel v. Buntrock, 571 A.2d at 776. Under these circumstances, the Delaware court ruled that the board had not conceded its disqualification and therefore demand was not excused.
 
 
 16
 In the present case, the order of events is completely different from the order in Spiegel and virtually identical to the order in Abbey. When confronted with Peller's complaint, the Companies did not pursue a motion to dismiss. Rather, they appointed the Committee and delegated to it the sole authority to evaluate the merits of the suit and determine the Companies' response. The Companies then waited for the Committee to make its report and, upon the Committee's negative recommendation, filed a motion to dismiss with the district court. Like the board in Abbey, the Companies did not seek a motion to dismiss until after they had delegated sole authority to the Committee. Because the Companies, like the board in Abbey, did not file a motion to dismiss until after they appointed the Committee and delegated to it the sole authority to evaluate the Peller suit, we find that the district court did not abuse its discretion when it found that the Companies effectively acknowledged that Peller was excused from making a demand.
 
 D. Application of Zapata
 
 17
 The Delaware Supreme Court has held on numerous occasions that following an independent committee's recommendation to dismiss a derivative suit in a demand-excused case a court should apply the two-step "Zapata" test to the motion:
 
 
 18
 First, the court must inquire into the independence and good faith of the committee and review the reasonableness and good faith of the committee's investigation. Second, the court must apply its own independent business judgment to decide whether the motion to dismiss should be granted.
 
 
 19
 Aronson v. Lewis, 473 A.2d 805, 813 (Del.1984) (citations omitted) (citing Zapata Corp. v. Maldonado, 430 A.2d at 788-89).
 
 
 20
 In the present case, the district court found that the members of the Committee were independent, although it stated that it was not "completely comfortable" with their prior connections to the Companies. Peller II, 707 F.Supp. at 525, 528. As to good faith, the court noted the Committee's heavy reliance on its retained counsel and the fact that the interviews through which the Committee gathered its information were not recorded or transcribed but rather summarized by its counsel, which summaries the Committee refused at first to release to Peller. Concluded the court: "This is not good faith." Id. at 529.[6]
 
 
 21
 The district court also found that the Committee's conclusions were not reasonable. The court noted that, by issuing its report only one day before the PSC's decision, the Committee rejected without adequate explanation the findings, made by technical consultants employed by the PSC, that several key decisions during the construction of the Vogtle plant were imprudent and cost the Companies several hundred million dollars.
 
 
 22
 The court found that the most substantial grounds for its rejection of the Committee's recommendation were the following: the Committee had implausibly blamed "middle management" personnel for the crucial decisions which cost the Companies hundreds of millions of dollars, given the Georgia PSC's exclusion of approximately 300 million dollars in misspent funds from the consumer ratebase, and the Committee had failed to conduct an adequate investigation of the damages sustained by the Companies. Peller II, 707 F.Supp. at 529-30. After reviewing this evidence, the district court invoked the "second step" of Zapata to hold that "even if ... defendants had met their burden [as to independence, good faith, and reasonableness], the items enumerated above would be sufficiently troubling" to warrant denial of the Companies' motion to dismiss. Id. at 530-31.
 
 
 23
 The Companies contend that, even under the Zapata test, the district court should have followed the Committee's recommendation. The Companies strenuously argue that the district court misapplied the "reasonableness" element of Zapata when it stated that "[the Companies] have not persuaded the court that the [Committee], as opposed to the PSC, arrived at the correct conclusion." Id. at 529-30. Although the Companies are correct that Zapata does not authorize de novo review of the correctness of a Committee's conclusions, the district court used that word only in passing. Indeed, the district court noted that the Committee had implausibly charged middle management for decisions costing the Companies several hundred million dollars and failed to investigate adequately the damages suffered by the Companies before the court held that the Companies had not "met their burden of establishing the good faith and reasonableness of the [Committee]." Id. at 530-31.
 
 
 24
 The Companies' arguments on appeal largely come down to the contention that under the traditional "plain vanilla" business-judgment standard, the Committee's recommendation should not be disturbed. The Companies are obviously correct that if the proper standard was the "plain vanilla" business judgment rule, Spiegel v. Buntrock, 1988 WL 124324 (Del.Ch.), the district court would be obligated to defer to the Committee's judgment. Having determined, however, in its discretionary authority that demand was excused, the district court properly applied the Zapata test to the Committee's recommendation. In light of the foregoing analysis, we find that the district court did not abuse its discretion when it rejected the Committee's recommendation and permitted this litigation to proceed.
 
 III. HOLDING
 
 25
 For the foregoing reasons, we AFFIRM the district court's denial of the Companies' motion to dismiss or, alternatively, for summary judgment.
 
 
 
 *
 Honorable Wesley E. Brown, Senior U.S. District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Because this is a derivative action, the suit was brought against the directors on behalf of the companies and their shareholders. For the sake of convenience, however, and because the companies in fact have defended the suit, the Court will refer to the defendants-appellants as "the Companies"
 
 
 [2]
 Under Delaware law, which governs this litigation (see Part II(B) infra ), before shareholders may sue on behalf of a corporation, they must make a demand on the board of directors asking it to redress the alleged wrong. There is, however, a notable exception to this demand requirement. When a shareholder demonstrates that the board is not capable of properly conducting the litigation (e.g., when the challenged wrong is self-dealing by the board), the court may excuse the demand as futile. See Zapata v. Maldonado, 430 A.2d 779, 783-84 (Del.1981); Aronson v. Lewis, 473 A.2d 805 (Del.1984)
 
 
 [3]
 Under Delaware law, the business judgment rule is a presumption that in making a business decision the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. When confronted with a derivative suit where demand is excused, however, Delaware courts are not bound by the business judgment rule. Aronson v. Lewis, 473 A.2d at 812-13
 
 
 [4]
 In its most significant clarification, the district court indicated that it had denied the Companies' motion to dismiss the derivative action only insofar as the action related to the Companies' decisions involving construction of the Vogtle plant. The court stated that "the proceedings in this action have substantially narrowed the issues to ones involving Plant Vogtle," and that the court "will grant [the Companies'] motion for reconsideration, to the extent that the order of December 23, 1988 could be construed as permitting [Peller] to proceed with all allegations of his complaint."
 
 
 [5]
 Rule 23.1 provides in part:
 In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.
 
 
 [6]
 In its order of June 29, 1989, the court modified its finding in response to the Companies' challenge, stating:
 The court did not determine that the failure of defendants to provide [Peller] with the [Committee's] interview notes constituted a lack of good faith in the [Committee's] investigation. Rather, the court was concerned with the [Committee's] conducting its investigation in such a way that the only record prepared was considered "privileged."
 The Companies construe this as a "finding" of good faith on the district court's part. This is inaccurate, but regardless of whether the district court renounced its earlier bad faith finding, it was clearly still concerned, in Zapata 's words, "for other reasons relating to the process, including but not limited to ... good faith." Zapata Corp. v. Maldonado, 430 A.2d at 789.